## QUINN *v.* STATE.

In Banc. Dec. 18, 1951.

No. 37988 (49 So. (2d) 396)

Jesse M. Coleman, W. M. O'Barr, Jr., and J. E. Caradine, for appellant.

Joe T. Patterson, Assistant Attorney General, for appellee.

McGehee, C. J.

On an appeal from a former conviction in this case, we reversed and remanded the cause as reported in Quinn v. State, Miss., 46 So. (2d) 802, wherein we stated that for all practical purposes the case was identical with that of Gathings v. State, Miss., 46 So. (2d) 800, decided

on the same day, June 12, 1950. The ground for reversal was more fully discussed in the opinion rendered in the companion case of Gathings v. State, supra, at that time. In both cases it was then shown that three alleged accomplices, "Tojo" Harris, Jack Valiant and Chester Walker, had implicated their co-defendants, Quinn and Gathings, in the stealing of the nine head of cattle in question from the pasture of Mr. H. G. Nason, and that these alleged accomplices had sworn positively and unequivocally before the jury in each case as to the participation of the said two defendants in the theft. However, on a motion for a new trial, they each took the witness stand and fully repudiated their entire story as related to the jury, saying that everything they had testified to on the trial was absolutely false, disavowed the alleged participation of the said two defendants in the crime, and denied that they themselves had taken any part therein or knew anything about the theft of the cattle, notwithstanding their previous pleas of guilty which were not shown to have been withdrawn. They testified that they had not been influenced by any one to change their story, but were doing so freely and voluntarily after being warned by the court of their right not to incriminate themselves by an admission of perjury in their former testimony.

Since the jury on the former trial did not have the benefit of the fact that these material witnesses for the State had repudiated their trial testimony, we thought that the cases against both Quinn and Gathings should be reversed in order that another jury could determine which, if either, of the stories against them were true.

We had not thought it an altogether hopeless prospect that these three alleged accomplices would at least adhere to either their testimony on the first trial or on the other hand to their testimony on the motion for a new trial. But such did not prove to be the case, and the appellant Henry Quinn was convicted on the second trial on an altered version of what these witnesses had testi-

fied to on the first trial, and wholly contrary to what they swore on the motion for a new trial. In view of this situation and because of the facts hereinabove stated, the Judges are unable to agree upon a decision that would finally dispose of the case on this appeal. Two of the Judges are in favor of discharging the defendant, one of the Judges is in favor of reversing the case for a new trial on the ground that the verdict is contrary to the weight of the credible evidence, and there is not a sufficient number in favor of an affirmance to bring about that result, three votes being required to affirm. Consequently, the case must be reversed for a new trial for the want of a sufficient number of votes to affirm the conviction.

On the first trial, the witness "Tojo", who plead guilty to burglary at the same term of court and who said that he had stolen cattle from Mr. Nason on about five former occasions, testified that eight white-faced red steers and one black one were driven up to the fence of Mr. Nason's pasture shortly after midnight on Saturday, May 7, 1948, and then through a four-strand wire fence, when a pole was put on one of the wires, and that five of the white-faced red steers were then loaded onto the defendant's, Quinn's, red Ford truck, and that the three other steers of similar description and the black steer were loaded onto a Chevrolet pickup truck of Gathings. On the second trial, this witness who lived on Mr. Nason's place and helped to feed his cattle testified that they "broke two strands of the fence wire, and raised up the top one" to get the steers through the fence and load them on the trucks.

On the first trial, "Tojo" also swore that he and Chester Walker left the pasture on the appellant-Quinn's, truck, and that said defendant was driving it, and that Jack Valiant and Shorty Thomas left ahead on the Gathings truck with the defendant Gathings driving it. On the second trial, he swore that he left the pasture on the Gathings truck in company with Shorty Thomas and Gathings, and that Jack Valiant and Chester Walker

were on the Quinn truck with Quinn driving it. Some of the Judges think that the jury should have reasonably inferred that if "Tojo" had been on either the Chevrolet pickup truck with Gathings, hauling four of the cattle, or on the big Ford truck with Quinn hauling five head of cattle, he would have remembered which one, and that his telling a different story on the second trial could be explained only upon the theory that he had ridden on neither the truck of Gathings nor that of Quinn, and that when testifying on the second trial he had for that reason forgotten what he swore to on the first trial.

On the first trial, "Tojo" further swore that after leaving the Nason pasture the two trucks came into Highway No. 8, some distance to the north, and that there a car pulled out ahead of them and that it was followed by the said Gathings' truck and the Quinn truck on to Highway No. 45 and then proceeded thereon to a place beyond Egypt, and later turned off the said main highway into a gravel road leading to a barn; that at this barn they saw two white men and a colored man, the white men being Mr. Jack Thompson and Mr. Ed (Glinn) who had preceded them in the car from where they entered into said Highway No. 8; and that at this barn the nine steers were unloaded. That thereupon he saw Mr. Jack Thompson count out money to the appellant, Henry Quinn, and that the latter stated to Mr. Thompson that this is only $500 and it is not enough, and that Thompson then agreed to and undertook to pay him another $100. That he, "Tojo", was to receive $100 as his part of the proceeds, but that Quinn failed to pay him, saying that he did not have the change. He also testified that he saw Mr. Thompson pay Gathings what Gathings stated was $300. He further testified on the first trial that they then left the barn and returned to a beer joint near Mr. Nason's pasture, and there separated. That the witness was arrested on the next Friday near the middle of the day and placed in the city jail at West Point. In the meantime he had made no

attempt to collect the $100 allegedly promised him. As to what occurred thereafter will be stated later.

On the second trial, "Tojo" was asked:

"Q. Did you see (at the barn where they saw the white men) anybody get paid off? A. Yes, sir.

"Q. In money? A. I didn't see what they got." On the second trial, the witness, after having stated on the first trial that he and Chester Walker rode from the pasture on the Quinn truck with him, and on the second trial that he was on the Gathings' truck with Jack Valiant, Shorty Thomas and Gathings, was asked:

"Q. Did you go to Okolona? A. No, sir.

"Q. Did the truck you were riding on go to Okolona? A. No, sir.

"Q. Did Oliver Gathings go to Okolona? A. No, sir." However, Jack Valiant and Chester Walker claim that they went to Okolona on the Gathings' truck with him, and that those on the Quinn truck also went there to get two checks, which were used by the white men in paying for the cattle, cashed at about 3 o'clock on Sunday morning, and "Tojo" further testified on the second trial that neither truck went to Okolona, and this is what he and Jack Valiant and Chester Walker all testified at the first trial, they having all testified unequivocally on the first trial that they returned home from the barn where they had seen the white men, and over the same route they travelled in going to that place.

Moreover, "Tojo" testified on the first trial that in getting the cattle out of the pasture they let down the fence, the question being "As I understand you then you let down the fence? A. Yes, sir." On the next page of his testimony on that trial, he was asked whether he "Put a pole over there and let the cows out? A. Come out over the wire fence." Again, that they "mashed two wires down with the pole" and then the cows just stepped over it. And, as heretofore stated, he testified on the second trial that they "broke two strands" and "we raised up the top."

On the first trial, "Tojo" testified that he was then

eighteen years old, and on the second trial, a year later, that he was then sixteen years old, and that he had known the defendant Quinn about three years, but that "Henry, he didn't know me." That they "made it up about the meeting"—that they were to have at Mr. Nason's pasture—over there at the "bottom" on the Monday night prior thereto.

"Q. Who made it up? A. Gathings is all I seen down there." On the second trial, he testified that he, Oliver Gathings, Henry Quinn, Jack Valiant, Chester Walker and Shorty Thomas "made it up down there (near the bottom) at the beer joint."

However, it sometimes occurs that the testimony of one witness may be so unsatisfactory that no verdict of guilty should be based thereon and the conviction be nevertheless justified on the testimony of some other witness or witnesses alone. We have therefore looked to the testimony of the other two alleged accomplices to determine whether or not the conviction appealed from should be affirmed, and in doing so it is found that:

On the first trial, Jack Valiant testified that Gathings came to his home on Monday night prior to the stealing on Saturday night and that they (he and Gathings) then agreed to steal the cattle. That when they all got them up to the wire fence of the pasture shortly after midnight "the wire was loose, (and that they) laid a pole down across the wire fence."

"Q. Where did they lay that pole? A. The strand from the top strand.

"Q. Laid it on top of the top strand? A. Laid it on top of the second strand." On the second trial, this witness testified that he, "Tojo", Gathings and Shorty Thomas, after leaving Big Rich Moseley's house that Saturday night, went to Mr. Nason's pasture and found the defendant Quinn and Chester Walker at the pasture when they got there. That they "taken two strands loose."

"Q. Did you drive the cows over the bottom strand? A. Yes, sir, we taken a pole, laid it down on the bottom

strand and the top strand, drove them through there.''
That is to say, ''under the top strand.'' He testified
that at the place where they got the cattle through the
fence, the wire ''was wrapped around a post, it was not
nailed, we just unwrapped it.''

''Q. Just undone it? Yes, sir.'' He further testified,
in substance, that the two middle wires were removed for
driving the cattle through, although the sheriff testified
on the first trial that he went to the scene and found a
''pole about eight or nine foot long laying across the
fence and there was one wire . . . with a forked pole
under the wire setting right up there,'' and further
stated, in substance, that between the wire that was
propped up with the forked stick and the next wire there
was a space ''I would say 3½ feet between the wires.''

On the first trial, Jack Valiant testified that he was to
receive as his part of the proceeds from the sale of the
cattle one-half of what the four head on the Gathings
truck brought; that he had this agreement with Gathings.
On the second trial, he testified that he was to receive
only $50 for his services. This was a material variance
since the nine head of cattle were shown to be worth ap-
proximately $1,750, as they weighed an average of nine
hundred pounds each. This witness also testified on the
first trial that they stole some white faced steers and two
black steers. He was asked on the first trial.

''Q. You know anything about money changing
hands? A. No, sir. I seen them out at the side talk-
ing. I don't know what they was doing.'' On the sec-
ond trial he was asked: ''Was there any money passed
hands there that night? A. Yes, sir.

''Q. What did you see about the money? A. I seen
Mr. Jack Thompson hand them two checks.

''Q. Handed them two checks? A. Yes, sir.

''Q. Who did he hand them to? A. Handed one to
Dukie (Gathings) and one to Henry Quinn.'' And he
further stated ''Yes, sir. I heard Henry talking about
that check.''

''Q. Who was he talking to? A. Mr. Jack.

"Q. What did he say in your hearing, Jack? A. Told him he did not think that was enough.

"Q. Did he say how much it was? A. "He said it was $500.

"Q. Did he say how much he thought it ought to be? A. He wanted another $100.

"Q. Jack, what did you do then? A. We left and went to Okolona.

"Q. Who all went to Okolona? A. Me, Gathings, Henry Quinn, 'Tojo,' Little Chess (Walker) and Shorty Wright (Thomas.)" He had testified on the first trial that they returned from the place where they delivered the cattle to Mr. Thompson and came on back home the same way that they had done up there. On the first trial, this witness stated that "We left (the Nason pasture) before Tojo and them started loading." That is to say, he left on the Gathings truck and said that Tojo remained and came on the Quinn truck. On the second trial, he said "me and Duke Gathings and Tojo" rode on the Gathings truck, and this notwithstanding that he had said on the former trial that "Tojo" left the Gathings truck when only two of the steers had been loaded thereon and went to the Henry Quinn truck a short distance away to help load it, and that the Quinn truck had not been loaded when they left "Tojo" there and went away in the Gathings truck.

On the second trial, Jack Valiant was asked: "Have you seen those cattle since? A. They passed us before we got to Okolona", although he testified on the first trial, as aforesaid, that they all returned home the same route they had travelled in going to the place where the cattle were delivered to Mr. Thompson and the other white man, Mr. Ed Green or Glinn.

Passing now to the testimony of the other alleged accomplice, Chester Walker, it is found that on both trials he testified that he knew nothing about the proposed stealing of the cattle until the appellant Henry Quinn came to his house that Saturday night and asked him to accompany him to his truck "to help load some

things,'' that he went with .Quinn to Mr. Nason's pasture and found Jack Valiant and ''Tojo'' already there. This was in contradiction of what Jack Valiant had testified on the second trial when he said that when he arrived at the pasture he found Quinn and Chester Walker there. The witness Walker testified on the first trial that he rode away from the pasture in the Quinn truck. He admitted on the second trial that on Friday prior thereto he had testified in the trial of Shorty Thomas that he knew nothing about the stealing, nor who was connected with it in any manner. Nevertheless, on the second trial of Quinn, which occurred during the following week, he testified of his own participation in the theft, saying that they ''raised the bottom three wires up'' of the fence in getting the cattle out, and that Quinn and Gathings were also implicated in the theft, and that he heard Quinn say something about a check after they had delivered the cattle to the white man. He further testified that he went to Okolona when they went to get the checks cashed, as also testified to by Jack Valiant, and notwithstanding that both the witness and Jack Valiant had testified on the former trial that they returned home immediately following the delivery of the cattle over the same route that they had first gone.

He claimed that the defendant Henry Quinn came to his house the following Friday or Saturday morning before daylight to inquire whether he had told anything about the cattle stealing and warned him not to do so.

The appellant Quinn had previously borne a good reputation, was more than fifty years of age and engaged in farming, and testified that he plowed throughout the afternoon of Saturday before the cattle were stolen that night and retired to bed early that evening. That his two stepsons and another boy used his truck that night to go to a picture show at Prairie. He was corroborated in this by his wife and the three boys who said they came in on a flat tire and that the truck remained parked on the yard the remainder of the night and was there with a flat tire the next morning. The appellant testified that

there was not a word of truth in anything that these alleged accomplices had testified against him, and that he knew nothing about the theft of the cattle.

The appellant Quinn also testified that he owned a green truck, whereas the alleged accomplices testified that he was using a red truck in transporting cattle from the Nason pasture, and no proof was offered by any credible witness in the community to disprove his statement that his truck was a green one. These alleged accomplices also testified that Gathings was using a black truck, whereas the proof on the former trial was that the only truck he owned was a red one.

The alleged accomplices were permitted to testify, without objection, that they each freely and voluntarily confessed their participation in the crime, and implicated both Quinn and Gathings in the same without having had any contact with one another from the time of the stealing until their confessions were made at the end of the following week. If these contentions were true, they would strongly support the theory that Quinn and Gathings had participated in the crime, since these accomplices were in separate jails and it is undisputed that they had no contact with each other in the meantime, and that they had not been advised as to what either of the others had stated to the officers in regard thereto. On the other hand, each of them admitted that he never did get any part of the proceeds of the sale, as promised, and made no attempt to collect the same from either Quinn or Gathings during the intervening week.

The testimony of Mr. Nason was sufficient to show from a count made by him on Friday, and again on Monday, that nine head of his cattle of the description given by "Tojo" had disappeared from the pasture, his attention having been attracted to the fact that some of the 186 head were missing by the fact that he noticed that his black steer was not among the herd when they were fed and counted.

It remains unknown, after diligent inquiry by the owner, as to what final disposition was made of the

cattle, and there is no testimony that either Quinn or Gathings ever requested any person in particular to cash a check or as to what they did with any of the money if they were paid in cash.

In view of the record now before us, a majority of the Judges do not feel justified in approving a conviction of this accused on the testimony of these alleged accomplices, given in chameleon-like fashion, without more corroboration in a number of material particulars, and the cause must therefore be reversed and remanded for another trial.

Reversed and remanded.

**Kyle, J.,** took no part on account of the case being briefed in his name as Attorney General on the former appeal.

**Roberds, J.** (dissenting).

In my opinion the question of the guilt or innocence of the defendant was a question for the jury. The jury having found accused guilty, I think the conviction should be affirmed.

**Alexander, J.,** concurs in this dissent.